IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:11-CV-268-FL

| | |
|---|---|
| S. DOUGLAS TAYLOR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) ORDER |
| UNITED STATES OF AMERICA and | ) |
| HEALTH NET FEDERAL SERVICES, | ) |
| LLC, | ) |
| | ) |
| Defendants. | ) |

This matter is before the court on defendants' motions to dismiss plaintiff's second amended complaint. (DE 30, 32). Plaintiff filed a response and defendants replied. In this posture, the issues raised are ripe for ruling. For the reasons that follow, defendants' motions to dismiss will be granted.

### STATEMENT OF THE CASE

Plaintiff filed an amended complaint on March 8, 2012, alleging claims against: (1) defendant United States of America ("United States"), challenging a November 10, 2011, administrative decision of TRICARE Management Activity ("TMA"),[1] under the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* ("APA"); and (2) defendant Health Net Federal Services, LLC

---

[1] TRICARE Management Activity is a Department of Defense agency tasked with administering the TRICARE program, see 32 C.F.R. § 199.2, a federal "managed health care program that is established by the Department of Defense under authority of [Title 10, U.S.C., Chapter 55]," which "includes the competitive selection of contractors to financially underwrite the delivery of health care services under the Civilian Health and Medical Program of the Uniformed Services." 10 U.S.C. § 1072(7). The term TRICARE is sometimes used interchangeably with the Civilian Health and Medical Program of the Uniformed Services, which appears as the acronym "CHAMPUS" in the regulations. See U.S. ex rel. Rahman v. Oncology Associates, 198 F.3d 489, 493 n. 1 (4th Cir. 1999).

("Health Net"), asserting claims under the TRICARE regulations, 32 C.F.R. § 199.1 *et seq.*; the Fifth Amendment of the United States Constitution; North Carolina common law defamation; and North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat., § 75-1.1 *et seq.* Plaintiff, a physician in Onslow County, North Carolina, seeks reinstatement as a TRICARE authorized provider, declaratory relief, money damages (both compensatory and punitive), and costs.

The United States moved to dismiss plaintiff's claims against it in the amended complaint for failure to state a claim under the APA, and moved for exemption from discovery. Health Net moved to dismiss claims against it for failure to state a claim and for lack of subject matter jurisdiction due to failure to exhaust administrative remedies.[2]

On November 26, 2012, the court denied the United States's motion to dismiss and granted Health Net's motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The court granted the United States's motion for exemption from discovery.

On November 28, 2012, plaintiff moved to amend the complaint to add allegations that defendant Health Net is a governmental or state actor. On December 5, 2012, the United States moved to vacate the United States's prior administrative decision and to remand for further administrative proceedings. On January 18, 2013, the court granted the United States's motion to remand and invited the parties to renew any matters still pending following the issuance of a new final administrative order.

On March 5, 2013, the United States filed a notice of decision and joint status report. In the notice, the United States reported that on February 19, 2013, TMA issued a "Final Agency Determination of Effective Date of termination of TRICARE Authorized Provider Status Following

---

[2] Defendants originally moved to dismiss in February 2012. After plaintiff filed his amended complaint, the court notified parties of an opportunity to clarify. Defendants did so by filing motions to dismiss on April 25, 2012.

2

Court Ordered Remand" (hereinafter, the "Final Agency Determination"). (DE 56-1). The Final Agency Determination stated it was issued "to correct the effective date of a May 18, 2011, initial determination issued by a TRICARE contractor [Health Net] that retroactively terminated [plaintiff's] TRICARE provider status to April 1, 2004." (Id.). The Final Agency Determination also stated that plaintiff's "status as a TRICARE authorized provider" "is terminated effective 15 calendar days from the date of this determination." (Id.). The joint status report stated that plaintiff intended to move to amend his complaint, and the court set a schedule for doing so.

Plaintiff filed a motion to amend on April 4, 2013, and the court granted the motion on June 24, 2013. Plaintiff's second amended complaint, filed June 28, 2013, is identical in all material respects to plaintiff's first amended complaint, except that it adds allegations regarding the Final Agency Determination dated February 13, 2013, (Second Am. Compl. ¶¶ 19-21), and it adds allegations regarding defendant Health Net's status as a governmental or state actor, (Id. ¶3).

On July 19, 2013, the United States filed the instant motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6), and for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), and Health Net filed its motion also before the court, pursuant to Rule 12(b)(6).

## STATEMENT OF FACTS

As alleged, plaintiff is a physician licensed by the North Carolina Medical Board to practice in the state since 1996, at a full clinical practice level. In 2004, plaintiff applied to become a TRICARE provider through Health Net. TRICARE is a healthcare system for military members and their dependants to obtain medical care that is paid for by the federal government. Health Net is the

Managed Care Support Contractor that implements and administers the TRICARE program for the Department of Defense in North Carolina (as part of the TRICARE North Region).

When plaintiff requested to become a TRICARE provider in 2004, the application asked whether plaintiff had any state medical license issues in the past five years, such as suspensions or revocations. Although plaintiff answered "no," he attached a full explanation of past disciplinary actions with medical boards which had occurred between 1985 and 1995. In 1986 his California license was suspended; in 1987 plaintiff's North Carolina license was revoked; in 1993 his New York license was revoked; and in 1995 he was denied a medical license in Ohio. Plaintiff has had no problems with his medical license in North Carolina since it was reinstated in 1996. Based upon his application, which included these disclosures, plaintiff was authorized as a provider in 2004 and his provider status was renewed in 2008.

In 2011, defendant Health Net sent plaintiff a notice that his provider status was being terminated because of the revocation of plaintiff's medical license in New York. Furthermore, the notice stated an intent to sue plaintiff for recovery of funds received from the government while he was an authorized TRICARE provider. Health Net further threatened involuntary collections against plaintiff, despite his repeated attempts to point out that he is a licensed physician and a qualified provider.

At the time that plaintiff's New York license was revoked, he was not an authorized TRICARE provider. That revocation was approximately eleven years before plaintiff applied to become a TRICARE provider. Health Net knew of that revocation when it approved his provider status in 2004, and renewed that status in 2008. Thus, plaintiff practiced medicine in North Carolina as an approved TRICARE provider from 2004 to 2011, but had his status retroactively revoked by

4

Health Net. Health Net also communicated to plaintiff's patients that he was not an authorized TRICARE provider and was not entitled to payment for any treatments provided.

Plaintiff engaged in numerous communications with Health Net, which refused to reconsider its position. Furthermore, plaintiff's appeal of Health Net's decision to TMA in 2012, provided him with no relief. TMA informed plaintiff that it lacked jurisdiction to conduct a hearing because the issues complained of were issues of law, and not of fact. (Second Am. Compl., Exs. F, G). TMA stated that under TRICARE regulations, 32 C.F.R. §§ 199.2(b), 199.10(a)(6) and (d), only disputes of fact are appealable to TMA. (Id.). Furthermore, TMA rejected plaintiff's interpretation of the TRICARE regulations. (Id. Ex. F).

Following the court's January 18, 2013, remand order, TMA issued the Final Agency Determination In the Final Agency Determination, issued on February 19, 2013, TMA maintains that under the terms of TRICARE program regulations, 32 C.F.R. 199.1, *et seq.*, plaintiff is not qualified to be an authorized TRICARE provider because plaintiff's medical license in New York was revoked and has not been restored. (Id. Ex. H.). TMA also states that the initial determination issued May 18, 2011, by Health Net, terminating plaintiff's status as a TRICARE authorized provider "should have been effective 15 days from the date of the initial determination," rather than retroactive to April 1, 2004. (Id.). Accordingly, the Final Agency Determination corrects and "correct[s] with notice" the effective date of the initial determination, stating that his status as a TRICARE authorized provider is terminated "effective 15 days from the date of this determination," or March 6, 2013. (Id.). Finally, the Final Agency Determination states that "any recoupment based on [plaintiff's] TRICARE provider status for any care provided prior to the effective date specified

5

in this notice is terminated and if there were any improper collections based on the Health Net retroactive termination of your provider status they will be reversed." (Id., p. 7).

With respect to defendant Health Net's status as a governmental or state actor, plaintiff alleges that the United States has delegated to Health Net the right to make the determination of what physicians meet the requirements to be "providers" under the TRICARE regulations. (Second Am. Compl. ¶ 3). Plaintiff alleges that all power that Health Net has exercised against plaintiff is derived solely from the authority granted to Health Net by the United States, and that Health Net "wield[s] all of the government's power when it comes to interpretation of the relevant regulations." (Id.).

## DISCUSSION

A.   Standard of Review

The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted is to eliminate claims that are factually or legally insufficient. Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). To survive a motion to dismiss, a pleading must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). In evaluating whether a claim is stated, "a court accepts all well-pled facts as true and construes these facts in the light most favorable" to the plaintiff, but does not consider "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009). Nor must the court accept "unwarranted inferences, unreasonable conclusions, or arguments." Id.

6

A Rule 12(b)(1) motion challenges the court's subject matter jurisdiction, and the plaintiff bears the burden of showing that federal jurisdiction is appropriate when challenged by the defendant. See McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). Such a motion may either assert the complaint fails to state facts upon which subject matter jurisdiction may be based or attack the existence of subject matter jurisdiction in fact, apart from the complaint. Adams, 697 F.2d at 1219.

B. Analysis

    1. Federal claims against Health Net

Plaintiff asserts two federal claims against Health Net: (1) for violation of the TRICARE regulations, 32 C.F.R. § 199.1 *et seq.*; and (2) for a due process violation under the Fifth Amendment to the United States Constitution. The court previously determined that plaintiff's claim against Health Net for violation of the TRICARE regulations is without merit because the TRICARE regulations do not create a private cause of action. See Regional Management Corp. v. Legal Services Corp., 186 F.3d 457, 461-62 (4th Cir. 1999). Plaintiff's second amended complaint and opposition to Health Net's motion to dismiss provides no basis to reconsider this ruling. Accordingly this claim will be dismissed.

With respect to plaintiff's claim under the Fifth Amendment, the court previously granted defendant Health Net's motion to dismiss on the basis that plaintiff had not alleged "that Health Net is a state actor, or fairly described as one." November 26, 2012, Order at 6. Plaintiff now contends the allegations in the second amended complaint overcome this obstacle, and that he should be allowed to proceed on his Fifth Amendment claim.

7

Assuming without deciding that Health Net may fairly be described as a state actor, however, plaintiff's Fifth Amendment claim fails for a separate reason. In particular, the Supreme Court has recognized an implied private right of action against a federal officer, based upon a violation of the Constitution, only in accordance with Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 397 (1971). The Supreme Court expressly has declined to extend Bivens to confer a right of action for damages against a federal government agency, see FDIC v. Meyer, 510 U.S. 471, 484-86 (1994), or against "private corporations acting under color of federal law." Correctional Services Corp. v. Malesko, 534 U.S. 61, 71 (2001); see Gantt v. Security USA, 356 F.3d 547, 552 (4th Cir. 2004) (holding that because the defendant "is a private entity . . . no Bivens claim lies against the company," and the district court properly dismissed the constitutional claim against as a matter of law). Therefore, where Health Net is a private entity allegedly acting under color of federal law, plaintiff's Bivens claim is foreclosed and must be dismissed.

Plaintiff argues that Malesko is distinguishable because it did not address whether a claim against an entity could be based upon a theory of direct liability against a corporation arising out of its "corporate policy to do harm to the plaintiff." (Opp'n at 8). But, Malesko and Meyer make clear that a constitutional claim against a federal agency or a private corporation acting under color of federal law is foreclosed regardless of the theory of liability. In particular, in describing Mayer, the Supreme Court noted:

> The purpose of Bivens is to deter individual federal officers from committing constitutional violations. Meyer made clear that the threat of litigation and liability will adequately deter federal officers for Bivens purposes no matter that they . . . are acting pursuant to an entity's policy[.] . . . This case is, in every meaningful sense, the same. For if a corporate defendant is available for suit, claimants will focus their collection efforts on it, and not the individual directly responsible for the alleged injury. On the logic of Meyer, inferring a constitutional tort remedy against a private entity like [defendant] is therefore foreclosed.

8

Malesko, 534 U.S. at 70-71 (internal citations omitted).

Plaintiff's suggestion that the court is precluded from dismissal on this basis by the statements in the court's November 26, 2012, order, also is unavailing. The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618 (1983). In this instance, the court previously dismissed plaintiff's Fifth Amendment claim because plaintiff failed to allege that Health Net is a state actor. (See November 26, 2012, Order at p. 5-6 (citing Edmonson v. Leesville Concrete Co., 500 U.S. 614, 620 (1991)). The court did not address, however, the additional binding limitations on a Fifth Amendment claim based upon Bivens, Malesko, Meyer, and Gantt, and the court did not need to do so in light of its holding. The court's discussion of the "state actor" requirement is not a "deci[sion] upon a rule of law," Arizona, 460 U.S. at 618, that binds the court's analysis of Bivens.

Moreover, the law of the case doctrine "does not and cannot limit the power of a court to reconsider an earlier ruling." Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 515 (4th Cir. 2003); Spencer v. Earley, 278 F. App'x 254, 262 (4th Cir. 2008). To the extent the court incorrectly suggests in its prior order that plaintiff's Fifth Amendment claim could proceed solely on the basis of an allegation that defendant is a state actor, the court clarifies here that state action is not the only requirement for a successful Bivens claim, in light of Malesco, Meyer, and Gantt.

2. State law claims against Health Net

The court previously dismissed all state law claims against Health Net based upon the allegations in the amended complaint. The additional allegations in the second amended complaint and documents attached thereto, concerning events following the court's November 26, 2012, order

9

do not provide a basis to alter this ruling. Nevertheless, plaintiff asks the court to "revisit its decision in its previous order dismissing plaintiff's unfair and deceptive trade practices claim," and to "view the 'unfair or deceptive trade practice' in question as being the arbitrary interference with a person's right to make a living, rather than defamation, as was done in the November 26, 2012 order." (Opp'n at 10). Plaintiff contends Health Net's conduct was unfair because (1) the governing regulations do not provide any basis for terminating his status as a qualified TRICARE provider, (2) Health Net's collection efforts were unfair, and (3) if Health Net was correct in declaring him ineligible in 2011, then the representation to plaintiff that he was authorized initially was deceptive. (Opp'n at 9).

This conduct alleged, however, is not of the type actionable under the UDTPA. Courts applying this act "differentiate between contract and deceptive trade practice claims, and relegate claims regarding the existence of an agreement, the terms contained in an agreement, and the interpretation of an agreement to the arena of contract law." Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998) (quotations omitted). "North Carolina law requires a showing of 'substantial aggravating circumstances' to support a claim" under the UDTPA. Id.; see also Strum v. Exxon Co., U.S.A., 15 F.3d 327, 333 (4th Cir. 1994) ("We think it unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations.").

In this manner, in PCS Phosphate Co., Inc. v. Norfolk S. Corp., 559 F.3d 212 (4th Cir. 2009), the Fourth Circuit upheld dismissal of a UDTPA claim where the complained-of conduct arose out of the parties' activities in the course of contractual performance. The court rejected the argument

10

that a railroad's alleged threats to abandon rail access to plaintiff's mine constituted "substantial aggravating circumstances," reasoning that "these alleged threats are nothing more than [defendant] stating that it believed it had a separate legal right to abandon its own tracks." Id. at 224. Thus, a defendant's conduct in exercising perceived rights and remedies under a contractual agreement with another party, even if allegedly contrary to the to the terms of the agreement, does not form the basis for a UDTPA claim.

In this case, plaintiff's relationship with Health Net was contractual in nature. Plaintiff applied to Health Net to become an authorized provider, and Health Net summarized some of the contractual rights and duties of a provider and Health Net as part of the application process. For example, in plaintiff's application process, Health Net stated:

> If at any time a provider no longer meets the minimum credentialing requirements, Health Net retains the right to *terminate any provider contract*.
>
> A full re-credentialing review of all *contracted health care providers* is conducted every three years to facilitate the maintenance of current and accurate files and to ensure the provider is still meeting all minimum requirements.
>
> . . . . Call 877-TRICARE (877-874-2273) and select the option for "*contracting and credentialing*" for the appropriate forms and instructions.
>
> In the case of a quality review proceeding for adverse action, Health Net, *at its sole discretion, may suppress a provider from the online provider directory and the referral management system until the issue is resolved*.
>
> In order to qualify for participation, providers must meet the following specifications
> . . . .
> - Agree to conditions of participation *per the network agreement.*

(Second Am. Compl., Ex. B) (emphasis added). In addition, upon application for re-credentialing in 2008, plaintiff signed a "Credentials Attestation, Authorization and Release," in which, *inter alia*, plaintiff "acknowledge[d] and agree[d] that Health Net . . . has a valid interest and legal requirement

11

to obtain and verify information concerning [plaintiff's] professional competence." (Compl., Ex. B, p. 4).³ This release form also specifically references plaintiff's obligations under a "Professional Provider Agreement." (Id.).

These contractual documents define plaintiff's relationship with Health Net. See Second Am. Compl., Ex. H, n.4 ("[A] provider who wishes to become a 'network provider' with a TRICARE contractor must enter into an agreement/contract with the TRICARE contractor."); see also 32 C.F.R. 199.17(q)(5) ("The provider must sign a preferred provider network agreement covering all applicable requirements."); Bd. of Trustees of Bay Med. Ctr. v. Humana Military Healthcare Servs., Inc., 447 F.3d 1370, 1375 (Fed. Cir. 2006) ("Network provider contracts are private agreements between the [providers] and [TRICARE contractor]. The government was not a party to those contracts, and the [providers] have no direct relationship with the government.").

Plaintiff's allegations that defendant improperly terminated his status as a qualified TRICARE provider, changed its position contrary to its initial acceptance of plaintiff's application, and made threats of collection activity, amount to a dispute over the parties' respective rights and remedies under the provider agreement. As such, they do not form the basis for a UDTPA claim. See PCS Phosphate, 559 F.3d at 224; see also Deltacom, Inc. v. Budget Telecom, Inc., 5:10-CV-38-FL, 2011 WL 2036676, at *4 (E.D.N.C. May 22, 2011) (in dismissing UDTPA claim, holding that "allegations relating to plaintiffs' contacts with defendant's subagents, where plaintiffs

---

³ Plaintiff attached a partial copy of this re-credentialing application to his amended complaint and second amended complaint. Where a complete copy is attached to the original complaint, the court refers to the more complete original exhibit. See Jeffrey M. Brown Associates, Inc. v. Rockville Ctr. Inc., 7 F. App'x 197, 202-03 (4th Cir. 2001) ("[C]onsideration of exhibits that were attached to the original complaint, omitted from the amended complaint, but still referred to, integral to, and relied upon in the amended complaint, furthers the policy of preventing plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting documents upon which their claims are based.").

12

supposedly informed these subagents that defendant was not meeting its requirements under the contract and would be terminated, implicate no more than plaintiffs' understanding of defendant's alleged breach"); Hageman v. Twin City Chrysler-Plymouth Inc., 681 F. Supp. 303, 307 (M.D.N.C. 1988) (dismissing UDTPA claim where "[p]laintiff's facts at best suggest that a modification of the written lease agreement occurred and that plaintiff, in the end, did not receive the consideration for which she bargained").

Plaintiff also contends that, if nothing else, he is entitled to relief based upon Health Net's refusal to refer patients to plaintiff during the time period between Health Net's initial determination in 2011, and the effective date of the Final Agency Determination in March 2013. (Second Am. Compl. ¶21). Plaintiff asserts that "he was clearly an authorized provider" during this time period, suggesting that the Final Agency Determination confirms his status as an "authorized provider" until the effective date of the Final Agency Determination. (Id.). But, the Final Agency Determination does not state that plaintiff was "authorized" to be a TRICARE provider up to the amended effective date of March 6, 2013 – to the contrary, it states there is "no dispute" that plaintiff did not meet the regulatory requirements to be a TRICARE provider. (Id., Ex. H., p. 3). Indeed, it confirms that Health Net's termination decision "should have been effective 15 calendar days from the date of the initial determination of May 18, 2011." (Id., p. 7).

Accordingly, the Final Agency Determination posits, at most, that Health Net failed to follow correctly the regulation specifying a fifteen-day delay in terminations. Health Net's error in this regard, however, does not alter the contractual nature of the relationship between plaintiff and Health Net, nor does it serve to transform Health Net's exercise of contractual rights and remedies into an unfair trade practice. See Canady v. Crestar Mortgage Corp., 109 F.3d 969, 976 (4th Cir.

13

1997) (holding that defendant's refusal to repay plaintiff's purchase money for an eight month time period following breach of contract, "albeit incorrect" in light of subsequent bankruptcy court ruling, did not rise to the level of a violation of the UDTPA); Branch Banking & Trust Co. v. Columbian Peanut Co., 649 F.Supp. 1116, 1121 (E.D.N.C. 1986) ("To assert in good faith a claim predicated on an erroneous interpretation of the law is not an unfair act . . . as the remedy therfor [sic] lies in the law itself, *i.e.*, such an erroneous view will not prevail."); cf. Walker v. Fleetwood Homes of N. Carolina, Inc., 362 N.C. 63, 70 (2007) (stating that while "a regulatory statute which governs business activities may also be a violation of N.C. Gen.Stat. § 75-1.1 . . . such a regulatory violation . . . does not automatically result in an unfair or deceptive trade practice").

In sum, plaintiff's state law claims against Health Net, including under UDTPA, must be dismissed for the reasons stated by the court in its November 26, 2012, order and for the reasons stated herein.

    3. Claim against the United States

Plaintiff's claim for relief against defendant United States arises under the APA, 5 U.S.C. § 500 *et seq.* Pursuant to the APA, a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702. "Agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

"The reviewing court shall . . . hold unlawful and set aside any agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

> [A] reviewing court must consider whether the decision was based on a consideration
> of the relevant factors and whether there has been a clear error of judgment . . . .

> Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Fort Sumter Tours, Inc. v. Babbitt, 66 F.3d 1324, 1335 (4th Cir. 1995) (internal quotation marks and omitted). Moreover, an agency's interpretation of its own regulation is to be accorded deference, "unless that interpretation is 'plainly erroneous or inconsistent with the regulation.'" Chase Bank USA, N.A. v. McCoy, 131 S. Ct. 871, 880 (2011) (quoting Auer v. Robbins, 519 U.S. 452, 461 (1997)). "[A]n agency's interpretation need not be the only possible reading of a regulation — or even the best one — to prevail." Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. 1326, 1337 (2013).

As an initial matter, plaintiff suggests that the court is bound by its previous ruling that TMA's 2011 decision may be arbitrary and capricious because of its retroactive nature. (Opp'n at 13, 14). TMA's 2011 decision, however, is no longer before the court. On January 18, 2013, the court granted the United States' motion to vacate the administrative decision then before the court and to remand for further administrative proceedings. The Final Agency Determination now before the court for review is not retroactive in effect. Therefore, the court's prior analysis of retroactivity is not applicable here.

Plaintiff also contends that TMA's decision to terminate plaintiff's authorized TRICARE provider status, effective March 6, 2013, is arbitrary and capricious because it is contrary to the TRICARE regulations and 10 U.S.C. § 1094. Plaintiff argues that 32 C.F.R. § 199.6 reasonably should be read as setting forth the qualifications a physician must possess in order to become a provider, and 32 C.F.R. § 199.9 reasonably should be read as setting forth what happens to a provider when he engages in "fraud, abuse or conflict of interest." (Opp'n at 13-14). The United States contends, by contrast, in accordance with the discussion in the Final Agency Determination,

15

that the regulations allow for termination of a physician's authorized TRICARE provider status due to revocation of a state medical license.[4]

TMA's interpretation of its own regulation is to be accorded deference in this case because it is not "plainly erroneous or inconsistent with the regulation." Chase Bank, 131 S. Ct. at 880. As plaintiff notes, 32 C.F.R. § 199.6 sets forth general qualifications a physician must have in order to become a TRICARE provider. In particular, a physician must be currently licensed and the "license must be at full clinical practice level." 32 C.F.R. § 199.6(c)(2). However, § 199.6 provides an exception to the general rule, stating "[r]egardless of any provisions in this section, a provider who is suspended, excluded, or terminated under Sec. 199.9 of this part is specifically excluded as an authorized [TRICARE] Provider." 32 C.F.R. § 199.6(a)(15).

In turn, 32 C.F.R. § 199.9 provides a basis for terminating plaintiff's authorized TRICARE provider status. In pertinent part, it begins by noting:

> This section . . . sets forth provisions for invoking administrative remedies in situations requiring administrative action to enforce provisions of law, regulation, and policy in the administration of [TRICARE] and to ensure quality of care for [TRICARE] beneficiaries. Examples of such situations may include *a case in which it is discovered that a provider fails to meet requirements under this part to be an authorized [TRICARE] provider.*

32 C.F.R. § 199.9(a)(2). Thus, contrary to plaintiff's argument, § 199.9 is not limited only to circumstances in which a TRICARE provider engages in fraud, abuse, or conflict of interest, but any case in which it is discovered that a provider fails to meet the requirements to be an authorized TRICARE provider.

---

[4] The government also argues that to the extent the court construes any claim by plaintiff as seeking monetary relief against the United States it should be dismissed for lack of subject matter jurisdiction. The court does not construe any claim by plaintiff as seeking monetary relief against the United States, and plaintiff's opposition to the government's motion to dismiss does not suggest otherwise. Accordingly, the court need not reach the government's motion to dismiss pursuant to 12(b)(1).

16

The regulation goes on to describe circumstances requiring termination matching those present in this case. In particular, it states: "Except as otherwise provided in this subparagraph, the following guidelines control the termination of authorized [TRICARE] provider status for a provider whose license to practice . . . has been temporarily or permanently suspended or revoked by the jurisdiction issuing the license." 32 C.F.R. § 199.9(g)(2). "[A] provider who has licenses to practice in two or more jurisdictions and has one or more license(s) suspended or revoked will also be terminated as a [TRICARE] provider." 32 C.F.R. § 199.9(g)(2)(i). "Professional providers shall remain terminated from the [TRICARE] until the jurisdiction(s) suspending or revoking the provider's license(s) to practice restores it or removes the impediment to restoration." 32 C.F.R. § 199.9(g)(2)(i)(A). Based on these provisions, TMA reasonably concluded that plaintiff, whose medical license in New York has been revoked and not restored, is subject to termination as a TRICARE provider.

Plaintiff suggests that it "makes no sense to say that a provider is terminated simultaneously with his being authorized to be a provider." (Opp'n at 13). The regulation does not, however, call for such a result. Rather, it provides for termination where "it is discovered" that a TRICARE provider "fails to meet requirements under this part to be an authorized [TRICARE] provider." 32 C.F.R. § 199.9(a)(2). Thus, the regulation expressly contemplates a circumstance, as here, where a TRICARE provider may have been authorized initially to be a TRICARE provider, but where later the provider's status is terminated due to discovery of a disqualifying condition. Interpreting the regulation to the contrary as plaintiff urges, to prevent termination of a previously authorized TRICARE provider, would run counter to TMA's duty to "enforce provisions of law, regulation, and

Case 7:11-cv-00268-FL   Document 93   Filed 03/19/14   Page 17 of 19

policy in the administration of [TRICARE] and to ensure quality of care for [TRICARE] beneficiaries." 32 C.F.R. § 199.9(a).[5]

Nothing in the authorizing statute requires a different result or different interpretation of the TRICARE regulations. Plaintiff cites 10 U.S.C. § 1094 for the proposition that it requires only that a physician have an unrestricted license, and it does not "call for an inquiry into a physician's past licensure problems." (Opp'n 14). This provision, however, expressly applies to "[a] person under the jurisdiction of the Secretary of a military department," and it does not mention physician, like plaintiff, who has applied with a TRICARE contractor to provide TRICARE medical services. In addition, § 1094 states only that a physician may not provide health care "under this chapter unless the person has a current license to provide such care." It does not state that the only requirement to being qualified as a TRICARE provider is having "a current license."

Furthermore, additional statutory provisions apply more particularly to the TRICARE program. For example, 10 U.S.C. § 1073(a) provides that "the Secretary of Defense shall have responsibility for administering the TRICARE program and making any decision affecting such program," where the program is defined as including "the competitive selection of contractors to financially underwrite the delivery of health care services under the Civilian Health and Medical Program of the Uniformed Services." 10 U.S.C. § 1072(7). These provisions thus leave broad authority to the Department of Defense to promulgate regulations implementing the TRICARE program. Therefore, where the statute is silent as to the termination of TRICARE provider status

---

[5] For similar reasons, plaintiff's suggestion that TMA should be estopped from terminating his provider status based on his prior status as an authorized provider, is unavailing. As an initial matter, plaintiff does not allege that TMA has ever stated to plaintiff that he was qualified to be a TRICARE provider. Even assuming it did, however, applying estoppel principles in such circumstances would be contrary to the regulations, which allow TMA to terminate provider status upon discovery of a disqualifying condition, see 32 C.F.R. § 199.9(a)(2), and counter to binding case law counseling against application of estoppel to the government absent affirmative and egregious misconduct. See Volvo Trucks of N. Am., Inc. v. United States, 367 F.3d 204, 211-12 (4th Cir. 2004) ("If equitable estoppel ever applies to prevent the government from enforcing its duly enacted laws, it would only apply in extremely rare circumstances.").

Case 7:11-cv-00268-FL   Document 93   Filed 03/19/14   Page 18 of 19

due to revocation of a physician's license, the court must defer to the agency's reasonable interpretation of the statute through its implementing regulations.  See America Online, Inc. v. AT & T Corp., 243 F.3d 812, 817 (4th Cir. 2001) (stating that courts must "defer to the reasonable interpretations of expert agencies charged by Congress 'to fill any gap left, implicitly or explicitly,' in the statutes they administer) (quoting Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984)).

In sum, where the Final Agency Determination is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), the court must dismiss plaintiff's APA claim.

## CONCLUSION

Based on the foregoing, defendant Health Net's motion to dismiss is GRANTED and defendant United States's motion to dismiss is GRANTED.  The clerk is directed to close this case.

SO ORDERED, this the 19th day of March, 2014.

_____
LOUISE W. FLANAGAN
United States District Judge